UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

              **MEMORANDUM & ORDER**
v.               22-CR-191 (WFK)

FIDEL ANTONIO TORRES HUERTERO,

    Defendant.

------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court is Defendant Fidel Antonio Torres Huertero's ("Defendant's") motion to dismiss the Indictment on equal protection grounds. ECF No. 35. For the reasons set forth below, Defendant's motion is DENIED.

## I. BACKGROUND

On April 27, 2022, a grand jury returned a then-sealed, single-count Indictment charging Defendant with illegal reentry, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Indictment, ECF No. 1. Defendant is a native and citizen of Mexico. Defendant's Memorandum of Law in Support of Motion to Dismiss the Indictment ("Def. Mem.") at 1, ECF No. 35-1.

On October 6, 2023, Defendant filed a motion to dismiss the Indictment on the grounds that 8 U.S.C. § 1326, the illegal reentry statute, violates the equal protection guarantees of the Fifth Amendment. Defendant's Motion to Dismiss the Indictment ("Def. Mot."), ECF No. 35. Specifically, Defendant argues 8 U.S.C. § 1326 was enacted with the purpose of discriminating against Mexicans and other Latinos. *See* Def. Mem. at 1-2, 4, 10-16. The Government filed its opposition on November 15, 2023. Government's Opposition ("Gov't Opp'n"), ECF No. 38. Defendant filed his reply on December 8, 2023. Defendant's Reply in Support of Defendant's Motion to Dismiss the Indictment ("Def. Reply"), ECF No. 40.

## II. MOTION TO DISMISS THE INDICTMENT

1

A.     **Legal Standard**

The parties disagree as to the applicable standard of review for Defendant's equal protection challenge. While Defendant argues the Court should apply the burden-shifting standard outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977) ("*Arlington Heights*"), Def. Mem. at 5-7, the Government argues the Court should apply rational basis review in light of the political branches' overwhelming authority over immigration matters, *see* Gov't Opp'n at 1-2. The Court does not decide which standard of review applies because Defendant's "motion fails under the more demanding standard of *Arlington Heights*." *United States v. Maldonado-Guzman*, 21-CR-448, 2022 WL 2704036, at *1 (S.D.N.Y. July 12, 2022) (McMahon, J.).

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 264-65 (1977) (citation omitted). But a plaintiff need not prove "the challenged action rested solely on racially discriminatory purposes." *Id.* at 265; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) ("[A]n additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks[.]"). Instead, plaintiffs must establish a discriminatory purpose or intent was one motivating factor of the decision. *Arlington Heights*, 429 U.S. at 265-66.

Because "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter*, 471 U.S. at 228, the Court must conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights*, 429 U.S. at 266. *Arlington Heights* sets forth a non-exhaustive list of factors to consider in determining

whether a challenged decision was based on an impermissible purpose, including: "the impact of the official action," i.e. if it "bears more heavily on one race than another," "the historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes," "substantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and the "administrative history . . ., especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 266-68 (cleaned up).

### B.  Application

Preliminarily, Defendant concedes "no still valid decisional law has found for a defendant challenging § 1326 on equal-protection grounds," Def. Reply at 2 (cleaned up), despite the plethora of similar challenges brought in district courts around the country, *see, e.g.*, *United States v. Contreras*, 22-CR-129, 2023 WL 3569274, at *19 (S.D.N.Y. May 17, 2023) (Gardephe, J.) (collecting cases). Eight courts in this Circuit alone have addressed equal protection challenges to § 1326, each of which denied the motions and upheld the statute as constitutional. *United States v. Hernandez-Perez*, 23-CR-00081, 2024 WL 1556893 (E.D.N.Y. Apr. 10, 2024) (Brown, J.); *Contreras*, 2023 WL 3569274; *United States v. Patterson*, 21-CR-103, 2023 WL 348970 (D. Conn. Jan. 20, 2023) (Bolden, J.); *Maldonado-Guzman*, 2022 WL 2704036; *United States v. Santos-Reynoso*, 21-CR-268, 2022 WL 2274470 (S.D.N.Y. June 23, 2022) (Swain, C.J.); *United States v. Crespo-Castelan*, 22-CR-009, 2022 WL 2237574 (S.D.N.Y. June 22, 2022) (Keenan, J.); *United States v. Maldonado*, 18-CR-308, ECF No. 196 (E.D.N.Y. Apr. 15, 2022) (Amon, J.); *United States v. Suquilanda*, 21-CR-263, 2021 WL 4895956 (S.D.N.Y. Oct.

3

20, 2021) (Marrero, J.). This Court denies Defendant's motions for substantially the same reasons.

Defendant first addresses the 1929 Undesirable Aliens Act ("UAA"), the statute which originally criminalized illegal reentry, arguing "racism was a key factor in the passage of the illegal reentry provision in the Act of 1929." Def. Mem. at 8; *see generally id.* at 8-11; Ex. B to Def. Mem., Aff. of Professor Eric S. Fish. The Government does not dispute this assertion, and this Court agrees with numerous other courts in finding "the 1929 Undesirable Aliens Act, a precursor to the modern-day Section 1326, . . . was undoubtedly enacted in the face of bald racial animus towards Hispanic people." *Suquilanda*, 2021 WL 4895956, at *5; *see also Santos-Reynoso*, 2022 WL 2274470, at *4 ("The UAA does have a 'dark history,' and 'at least some members of Congress were motivated to criminalize reentry because of their support for eugenics and opposition to the increased presence of the 'Mexican race' in the United States.'") (quoting *United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815, 820 (S.D. Tex. 2022)); *Maldonado-Guzman*, 2022 WL 2704036, at *3 (same). However, because § 1326 "was not enacted as part of the 1929 UAA," *Patterson*, 2023 WL 348970, at *4, "the proper focus of the Court's inquiry is the intent of the Congress that enacted the [Immigration and Nationality Act] in 1952, not the intent of the 1929 Congress and the historical background of the UAA," *Crespo-Castelan*, 2022 WL 2237574, at *3; *see also Santos-Reynoso*, 2022 WL 2274470, at *3 ("*Arlington Heights* directs the Court to look at the motivation behind the official action being challenged, which is not the 1929 Act in this case, but rather section 1326 from the 1952 INA.") (cleaned up).

Defendant argues the discriminatory purpose animating the 1929 UAA's illegal reentry provision should be attributed to 8 U.S.C. § 1326, codified in 1952 as part of the Immigration

4

and Nationality Act ("INA"), because Congress failed to address the "taint" of that impermissible motivation when reenacting the illegal reentry provision. Def. Mem. at 4; *see also id.* at 13 ("The legislative history of 1952 demonstrates a choice not to mitigate the racially disparate impact of illegal reentry, nor to repudiate its eugenicist origins."). The Court disagrees. "Although the historical background of a legislative enactment is relevant to the question of intent under *Arlington Heights*, the Supreme Court has made clear that '[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.' In other words, the burden of proving that a law was enacted with discriminatory intent falls on the challenger, and past discrimination does not 'flip[] the evidentiary burden on its head.'" *Maldonado*, 18-CR-308, ECF No. 196, at *17 (quoting *Abbott v. Perez*, 585 U.S. 579, 603, 604 (2018)). "[S]ubstantive" differences between an original and reenacted legal provision "are sufficient under Second Circuit precedent to preserve the presumption of legislative good faith." *Patterson*, 2023 WL 348970, at *5 (citing *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010)).

As Defendant recognizes, the 1952 Congress did not simply reenact the UAA's illegal entry provision. *See* Def. Mem. at 14, 14 n.13. Instead, while "similar" to the 1929 provision, Congress "created a new provision of the United States code" in 1952, *United States v. Machic-Xiap*, 552 F. Supp. 3d 552 F.Supp.3d 1055, 1077 (D. Or. 2021), which contained several changes from the prior law, including: (1) "replac[ing] the reentry offenses set forth in three prior statutory sections" and their corresponding criminal penalties and "instead subject[ing] all reentry defendants to the same penalty;" (2) "add[ing] a new basis for liability: being found in the United States after a prior deportation—a continuing offense;" and (3) removing language allowing a defendant to collaterally challenge the validity of their underlying deportation proceedings, *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1147 (9th Cir. 2023), *cert. denied*,

144 S. Ct. 703 (2024) (citations and internal quotation marks omitted).  Because "[t]he changes between § 1326 and the repealed UAA provision . . . qualify as substantive," "the racially motivated history behind the 1929 statute does not create a presumption that the 1952 law was based on discriminatory motives." *Patterson*, 2023 WL 348970, at *5; *see also Maldonado-Guzman*, 2022 WL 2704036, at *3 ("[A]lthough both statutes criminalized unlawful reentry, there are key substantive differences between the two statutes that establish that section 1326 is not a mere reenactment of the UAA.") (citation and internal quotation marks omitted); *Maldonado*, 18-CR-308, ECF No. 196, at *17-18 (finding 8 U.S.C. § 1326 had "new exceptions and a larger reach" than the 1929 illegal reentry provision and noting "[a] legislature's decision to put more force into deterring conduct can hardly be considered insubstantial").

Defendant argues *Ramos v. Louisiana*, 590 U.S. 83 (2020) and *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020), support imputing the 1929 Act's discriminatory purpose to the 1952 illegal reentry statute because "Congress has never addressed the law's 'tawdry past,' and it remains tethered to the racial animus that permeated its creation."  Def. Mem. at 3; *see also id.* at 11-12 ("[R]ecent Supreme Court precedent makes clear that reenactment of a given law passed with discriminatory purpose does *not* cleanse it of the original invidious purpose."). While these cases undoubtedly confirm the relevance of a statute's historical context and "support the contention that subsequent enactments of a statute do not erase its historical context," "courts examining the enduring taint theory . . . have cautioned that the discriminatory motives underlying the passage of a previous statute, while relevant, are not determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature," *Santos-Reynoso*, 2022 WL 2274470, at *3 (citations and internal quotation marks omitted); *see also Machic-Xiap*, 552 F. Supp. 3d at 1078 ("Under existing Supreme Court precedent, the fact that

6

racial prejudice played an invidious and overwhelming role in the creation of the Undesirable Aliens Act of 1929 does not compel the Government today to prove that Congress expressly disavowed all prior improper motives when defending a later-enacted law against an equal protection challenge, even when the historical foundation of the current law can be traced back to the earlier statute."). While the history behind the 1929 UAA is undoubtedly troubling, this Court agrees with other courts in finding "the discriminatory motivations behind the enactment of this earlier statute, while relevant, are of limited probative value to the evaluation of the constitutionality of § 1326." *Maldonado-Guzman*, 2022 WL 2704036, at *3; *see also Patterson*, 2023 WL 348970, at *5 ("After twenty-three years had passed, only thirty congressmen from the 1929 Congress remained in office in 1952.") (cleaned up); *Santos-Reynoso*, 2022 WL 2274470, at *4 (finding "the historical context leading to the passage of the UAA is quite remote from the factors leading to the enactment of the INA.") (citation and internal quotation marks omitted). Indeed, "[a]lthough the 1952 Congress did not address or actively repudiate the racist history behind the 1929 illegal reentry provision, the Court cannot 'take Congress's silence about the history of the UAA as evidence that it adopted any prior discriminatory intent.'" *Patterson*, 2023 WL 348970, at *5 (quoting *United States v. Barcenas-Rumualdo*, 53 F.4th 859, 864-65 (5th Cir. 2022)).

Defendant further argues the 1952 INA, and the illegal reentry provision therein, were passed with discriminatory motives. Def. Mem. at 11-16. In so arguing, Defendant points to President Truman's veto of the INA, in which he "explicitly called out the law for its racism;" Attorney General Peyton Ford's letter supporting the illegal reentry provision's expansion, in which he used the slur "wetback;" Congress's consideration of a bill which "several members referred to as the 'Wetback Bill;'" the 1950 Senate Judiciary Committee Report which served as

7

the foundation for the INA; and affidavits submitted by Professor S. Deborah Kang discussing the anti-Mexican and Latino racist views promulgated by some members of Congress and staffers between the passage of the UAA and INA, to include close coordination between members of Congress and white-supremacist advocates. *See* Def. Mem. at 12-16; Def. Reply at 10-11, 12-16; Ex. C to Def. Mem., ECF No. 35-3 at 22-76 (First Aff. of Prof. Kang); Ex. D to Def. Mem., ECF No. 35-4 at 1-103 (Second Aff. of Prof. Kang).

The Court concludes this evidence does not support that 8 U.S.C. § 1326 was adopted with a discriminatory motive. First, the Court agrees with the conclusions of the numerous courts which have previously addressed President Truman's veto, Attorney General Ford's letter, and Congress's contemporaneous consideration of the so-called "Wetback Bill," and finds these do not support the proposition that § 1326 was adopted with racial animus. *See, e.g.*, *Santos-Reynoso*, 2022 WL 2274470, at *5 ("Nor does the Court find the statements made by President Truman or Attorney General Ford to be particularly probative, as they were not members of Congress who voted on the INA, and thus their views provide no direct insight into the motivations of the 1952 Congress who passed the law.") (cleaned up); *Carrillo-Lopez*, 68 F.4th at 1149 ("The Ford letter's use of the term 'wetback' sheds no light on Congress's views. The Ford letter quoted a separate report that employed that term when recommending that Congress clarify immigration officers' search authority to assist in enforcing the law against smugglers and persons who harbored illegal entrants."); *Patterson*, 2023 WL 348970, at *7 ("But even though § 1326 and S.B. 1851 [the so-called "Wetback Bill"] address related subject matters and were debated in the same year, the legislative history of S.B. 1851 does not bear directly on the purpose underlying § 1326, just as debate over the quota system—which actually was included in the INA—does not directly reveal congressional motivations in enacting § 1326."); *Crespo-*

*Castelan*, 2022 WL 2237574, at *4 ("President Truman's veto statement tells the Court nothing about what he thought about § 1326 specifically because his full statement reveals that his concern with the INA was mostly about the INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latin America.") (cleaned up); *Barcenas-Rumualdo*, 53 F.4th at 867 ("The proposal of a crudely nicknamed bill does not carry Barcenas-Rumualdo's burden of proving that Congress enacted § 1326 with racial malice.  The fact that individual lawmakers dubbed a bill something derogatory, without more, says nothing of the motivations of Congress 'as a whole' regarding the INA or § 1326 specifically.") (citation and internal quotation marks omitted).

Defendant further argues the 1950 Senate Report, in response to which Congress drafted the INA, "was replete with racism" and "endorsed" the racially discriminatory intent in the UAA.  Def. Mem. at 14 n.11; *see generally* Senate Judiciary Comm., The Immigration and Naturalization Systems of the United States, S. Rep. No. 81-1515 (1950), *available at* https://babel.hathitrust.org/cgi/pt?id=uiug.30112046491822&seq=1&q1=reentry.  While certain passages in the report "describe racist attitudes and detail the views of nativists who sought immigration policies that would promote immigration policies that promote white supremacy," *Patterson*, 2023 WL 348970, at *6 (quoting *United States v. Calvillo-Diaz*, 21-CR-445, 2022 WL 1607525, at *8 (N.D. Il. May 20, 2022), none of the language cited by Defendant—including the Report's use of the slur "wetback"—relate to the illegal reentry provision. *See* Def. Mem. at 14 n.11, 20, 20 n.20.  As such, this language in the Report does not support Defendant's claim that 8 U.S.C. § 1326 was motivated by discriminatory animus.  *See Patterson*, 2023 WL 348970, at *6 (Senate Report including nativist language in a discussion of the "quota system rather than the criminalization of unauthorized entry or reentry" does not support

9

discriminatory purpose); *Calvillo-Diaz*, 2022 WL 1607525, at *8 (explaining one reason "comments in a Senate Report fail to show that a discriminatory purpose underlay the 1952 reenactment of § 1326" is because "they do not relate to the criminalization of unauthorized entry or reentry, but to the quota system and the debate over whether to impose quotas on Western Hemisphere nations"). The *Calvillo-Diaz* court in fact found the "report, far from raising a strong inference from silence that Congress acted out of invidious discrimination, better supports an inference that Congress based its decision on legitimate concerns about securing the border from unauthorized entry from all directions." 2022 WL 1607525, at *8. Indeed, the section covering the original illegal reentry statute and other immigration offenses contains no disparaging or discriminatory language towards Latinos. *See* The Immigration and Naturalization Systems of the United States, S. Rep. No. 81-1515 at 644-656.

Defendant further asserts certain undoubtedly racist statements made by members of Congress around the time of the INA's adoption evidence the racial animus behind 8 U.S.C. § 1326. *See, e.g.*, Def. Reply at 10-11; First Aff. of Prof. Kang at 47-49; Second Aff. of Prof. Kang at 17-20. Similarly, Defendant points to Professor Kang's new research—not included in prior versions of Professor Kang's affidavit addressed by other courts—regarding the connections between alleged white supremacist activists and certain members of Congress and their staff who were influential in pushing forward and drafting the INA. *See* Def. Mem. at 13-14; Def. Reply at 14-15; First Aff. of Prof. Kang at 19-36. However, "[f]or strict scrutiny to apply under *Arlington Heights*, the court must find 'evidence that the legislature as a whole was imbued with racial motives,'" *Crespo-Castelan*, 2022 WL 2237574, at *4 (quoting *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021)), and this Court declines to attribute racial motivations to Congress as a whole based on certain legislators' statements or ties between

10

influential congresspeople and their staff with purportedly racist individuals and organizations, particularly as Defendant and Professor Kang fail to connect these statements or activities to the passage of the illegal reentry provision specifically. *See, e.g.*, *Santos-Reynoso*, 2022 WL 2274470, at *5 ("Although the statements made by a handful of legislators around the time period of the INA's passage are deeply disturbing, the Court recognizes that these statements were not made about Section 1326 specifically, and cannot be used to ascribe intent to the other hundreds of members of Congress.") (citation and internal quotation marks omitted); *Crespo-Castelan*, 2022 WL 2237574, at *4 ("Finally, the racist statements made by Congressional sponsors of the bill do not demonstrate that the 82nd Congress was motivated by racial animus. Statements made by individual members of Congress 'cannot be attributed to the entire Congress, especially when others in Congress expressed the opposite sentiment.'") (quoting *Machic-Xiap*, 552 F. Supp. 3d at 1075); *Carrillo-Lopez*, 68 F.4th at 1150 ("The statements of Representative Thomas Jenkins and Senator Walter George, which in any event were made in the context of debating the national-origin quota system rather than in discussing § 1326, are not probative of the intent of the legislature as a whole."); *Machic-Xiap*, 552 F. Supp. 3d at 1075 ("Second, Mr. Machic-Xiap notes that Representative Wood, a supporter of the INA, asserted that there was 'something to' 'racial origin,' and that 'the Western European races have made the best citizens of America.' That remark is unquestionably racist. Like President Truman's statement, however, the record suggests that this statement was more about the quota provisions of the INA, not § 1326 specifically."); *see generally Patterson*, 2023 WL 348970 at *7 (noting while "the repeated use of the term 'wetback' in contemporary debates over S.B. 1851 suggests that racial animus may have been present in Congress at the time," the defendant "fails to

provide any direct evidence linking racial animus against Latinos to the enactment of Section 1326") (cleaned up).

It is unsurprising that Defendant has not pointed to evidence linking anti-Mexican or anti-Latino animus to the enactment of 8 U.S.C. § 1326, as Professor Kang herself notes "Congress rarely discussed the recodification of the 1929 law during the deliberations over the McCarran and Walter bills." First Aff. of Prof. Kang at 45; *see also* Second Aff. of Prof. Kang at 21 ("In this context, Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions in the 1952 Act. It made no effort to examine or cleanse the anti-Mexican racism that infected the Act of March 4, 1929."). Indeed, "[a]n exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but §§ 1325 and 1325 were not among the debated sections." *Hernandez-Lopez*, 583 F. Supp. 3d at 821 (quoting *United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977)); *see also Carrillo-Lopez*, 68 F.4th at 1146 ("There was no discussion of [the illegal reentry provision's] impact on Mexicans or other Central and South Americans.").

Ultimately, as Chief Judge Swain stated in *Santos-Reynoso*:

> Professor Kang admits that "Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act." (Cohen Decl., Ex. B. at 21.) Given the Court's obligation to presume Congress acted in good faith, and Defendant's failure to tie particular evidence to the specific motivations underlying Section 1326, the Court finds Congress' silence on the issue of racial discrimination to be insufficient for Plaintiff to meet her burden. *See [United States v.] Salas-Silva*, [20-CR-00054,] 2022 WL 2119098, at *3 [D. Nev. June 13, 2022)] (citing *Abbott*, 138 S. Ct. at 2324).

2022 WL 2274470, at *5. This Court agrees. *See also Contreras*, 2023 WL 3569274, at *19 ("Five courts in this Circuit have rejected *Arlington Heights* challenges to Section 1326. These

12

courts found that – while there is substantial evidence that (1) nativism and racism animated many of the legislators who enacted the Undesirable Aliens Act of 1929, and (2) certain legislators made racist statements when the INA was enacted in 1952 – there is little to no evidence that Section 1326 itself – which was enacted in 1952 and subsequently reenacted numerous times – was motivated by racism.") (collecting cases); *Hernandez-Lopez*, 583 F. Supp. 3d at 822 ("Hernandez-Lopez had not pointed to evidence of racism motivating the reenactment of § 1326, as opposed to other provisions of the 1952 Act.").

Moreover, Congress has amended 8 U.S.C. § 1326 numerous times since 1952. Second Aff. of Prof. Kang at 34. In agreeing with numerous courts which addressed these amendments, this Court finds Defendant has failed to demonstrate 8 U.S.C. § 1326 was amended with discriminatory intent. *See, e.g.*, *Maldonado-Guzman*, 2022 WL 2704036, at *5 ("Furthermore, the Court recognizes that Congress has amended § 1326 several times since its original enactment in 1952 in order to increase Section 1326's deterrent value, and with nary a word suggesting discriminatory animus to those of Latin American descent.") (cleaned up); *Santos-Reynoso*, 2022 WL 2274470, at *5 (rejecting Professor Kang's argument "that Congressional silence is automatically indicative of discriminatory intent, and that the statute at issue was fatally infused with racial animus from the passage of the UAA"); *Maldonado*, 18-CR-308, ECF No. 196, at *16-17 ("Evidence of animus in the post-1952 amendments is even less apparent," noting Professor Kang herself acknowledges the limited information surrounding the 1990 amendment and rejecting Professor Kang's arguments as to discriminatory intent manifesting through disparate impact and race-neutral vocabulary); *Salas-Silva*, 2022 WL 2119098, at *4 ("[I]nferences of racial animus cannot be drawn from congressional silence as there is the

necessary presumption of good faith in these amendments, especially in light of the fact that Congress has numerous legitimate motivations for enacting and preserving Section 1326.").

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion. The Court further denies Defendant's request for a hearing. *See Contreras*, 2023 WL 3569274, at *20 ("Moreover, because the factual allegations upon which Defendant relies are insufficient to show that the statute at issue is unconstitutional, the Court concludes that an evidentiary hearing is unnecessary.") (cleaned up).

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 25, 2024
Brooklyn, New York